ROANE}, Judge.
The agreement between Love and Braxton of the 1st of July, 1783, was intended to secure the payment of a debt due by the latter to the former. Where the direct purpose of an agreement is to insure the performance of any act, the penalty to secure it shall not be considered as liquidated damages, and obstruct the specific execution of the agreement. This is supposed to be more strongly the case, where the purpose is to secure the payment of a debt certain, or capable of being ascertained; the principle then falling in with the general attribute of equity, to relieve on payment of the principal sum due, with interest. It is not denied that parties may liquidate their damages; but this case is not of that kind. In this case, a power to revoke is only reserved, at most, by implication; and the term forfeited, used in the agreement, as relative to the .£3000, is strong to confirm the general idea resulting from the nature of the instrument, i. e., as importing that sum to *bé a penalty, and not the agreed damages. The case of Howard v. Hopkins, 2 Atk. 371, is supposed to be similar to the present. That was a bill for the specific performance of articles for the purchase of an estate, having a proviso that if either party should break the agreement, he should pay £100. The defendant, meeting a better offer, sold the land, yet a performance was decreed ; and by lord Hardwicke, the stipulated sum cannot let him off from a performance. It might have been put in to pay for the plaintiff’s trouble in viewing the land, and in case the defendant should be unable to make a title. That it was the common case of a penalty, which is never held to release from a performance.
The agreement then, notwithstanding the penalty, created a lien upon thé English estate in the appellant’s favour: But that estate is beyond the reach of our courts, and perhaps, beyond the reach of any court, in' consequence of the decree of the English court of chancery relating thereto. If, then, Mr. Braxton is now indebted to the appellant, and the latter has hot released that lien by subsequent agreements, (both' of which questions remain to be decided betwéen him and'the representatives of Braxton,) the appellant has a right to proceed against Ham, if, in depriving him of his lien, the appellee has contravened the principles of equity: or, in other words, if he purchased, or went on to complete his payment to Mr. Braxton, having knowledge of the lien aforesaid.
■ The issue, made up and tried in Williams-burg, admits of two enquiries, 1. Whether this knowledge existed ? 2. Whether any, and what damage arose to the appellant from the intromission of the appellee ? The jury find the knowledge, and assess £1380 damages. This last enquiry respecting damages is- involved with Mr. Braxton’s part of the case. The verdict of the jury, in relation to it, must bé taken to be conditional; for surely, if it should turn out hereafter that nothing was due by Braxton to the 'appellant, or that the lien on the English estate had been previously released by him, (both which enquiries are still pending and undetermined,) *it will undoubtedly appear to the court, and must so have been understood by the jury, that no'injury has been sustained by the appellant. It could, therefore, have been wished that this cause should have been decided in toto, so as to make an end of it as to all parties, and to the whole subject: But as there seems no probability of Mr. Braxton’s having a representative, and as it would be unreasonable to hang 'up Love forever in respect of a debt to which, as it now seems, he has a just title, I will give my opinion on the subject between the now parties, with this reservation nevertheless, that the court of chancery, if it is desired, should, by permitting Ham to become administrator quoad hoc, or in some other mode to be devised by it, enable him to defend himself by taking either of the grounds just mentioned. This, however, will be wholly unnecessary, if that court is of opinion against the appellant upon the other point.
Upon that point under the positive and contradictory testimony which exists, it was emphatically proper for. the court of equity to direct an issue. In a case of this sort the court ought not to lose sight of the superior advantage of a viva voce examination in relation to the manner of deposing; nor even of the power of the jury, as in other cases, to find a verdict on'their own knowledge. Both these clues to truth are lost in a trial by mere depositions. In the present case, it is not indeed stated, that there was other testimony than that now before us: But neither is the contrary stated ; which it is supposed the appellee ought to have done, if he meant to appeal from the verdict. In the' silence of the record on this subject, it is rather to be presumed that enough testimony was given to warrant the verdict. This inference is corroborated by the silence of the judges. in relation to its being contrary to the weight of evidence. It is further corroborated by the consideration that the loose assertions of some of the jury (stated by Mr. Starke), only go to the point of damages, and not to the point of the want of knowledge of the lien. I cannot, therefore, in this naked case, *an emphatic case for weighing testimony and deciding on credibility, agree with the chancellor in departing from the verdict. The loose matter, stated in Mr. Stark’s affidavit, of conversations by some of the jurymen which they refused to swear to, and which, if sworn to, touched not the point submitted on the first issue, is entitled to no credit whatever. It is infinitely looser than any thing of the kind ever before relied on: It should not, therefore, have weighed with the judge, as it seems by the decree to have done, in departing from the verdict.
With my present impressions, under the existing circumstances of this case, it is not necessary for me to say, on which side, in my judgment, the weight of the written testimony lies. It is at least equivocal, and thus determines my opinion in favour of the verdict, subject to the condition before *1043 stated in relation to Mr. Braxton’s part of the case.
I am therefore of opinion, that the decree ought to be reversed, and entered for the appellant, subject, &c. as before mentioned.
FLEMING and CARRINGTON, Judges.
What would have been the effect of Love’s power of attorney in England, is unnecessary for us to decide, under the view we have taken of the cause.
There was no occasion for directing the issue, as the evidence all stood in the record, and there was neither conflict among the witnesses, nor imputation upon their credit. Therefore, as the chancellor was justly dissatisfied with the verdict, he was at liberty to set it aside, and decide the cause himself ; especially as it does not appear that the former witnesses were examined again, or any new evidence introduced, upon the trial. Southall v. M’Keand, 1 Wash. 337 ; Wythe’s Rep. 120.
Delivered from the verdict, the first en-quiry that presents itself is, Whether Ham purchased with notice of Love’s power ? And we think, the evidence falls very far short of establishing the fact. For the whole proof, with regard to *it, is the testimony of single witnesses, to distinct facts, unsupported by circumstances, against the positive denial of the answer; and therefore not to be regarded.
A slight review of the case will establish this.
Love’s power is dated the 1st of July, 1783: Ham arrived in Virginia the 15th : And the purchase was made on the 18th. It was therefore next to impossible that Ham should have known of the power, as Braxton took pains to conceal it, and he had no means of obtaining information.
The question then is, Had he notice of it at any time afterwards, before the money was paid, and the deed was executed ?
Ronald says, that, without any authority from Love, he mentioned to Ham in the city of Richmond, about November 1783, that there was such a power. But the probability is, that the conversation, whatever it was, and whenever it happened, was very loose, and that he was mistaken as to the period. For he speaks of Ham’s purchase as conditional, whereas there is the clearest proof that it was absolute: And the testimony shews that the interview could not have been at the time he states. For Shermer, Currie and Reddick prove that Ham could not have been in Richmond during the month of November, being confined by sickness in Hanover town from the 12th of October ; which is confirmed by Braxton’s letter to Love late in November 1783 ; and by the circumstances, that Aldridge was the confidential counsel ■of Ham until the spring of the next year; that Braxton was himself endeavouring to purchase Mary C aiborne’s moiety until March 1784, in order to enable him to keep up the trade with Ham; that Ham did not think of purchasing until Braxton declined ; and that he bought it in August 1784. All these circumstances render it probable that the conversation was after the 24th of February, when Braxton executed the deed, and the subsequent departure of Aldridge from this country in March, as Ham might then stand in need of other counsel, before he would embark in the additional purchase. But be that as it may, *the alleged conversation is supported by no other person, or circumstance ; and therefore the deposition of that witness is unavailing against the positive denial in the answer.
Claiborne, the next witness, thinks, that in a jocular conversation, it was mentioned in the presence of Ham and Aldridge, at his house, in October or November, by Shermer, as coming from Beal; but admits that Ald-ridge’s letter makes him doubt: And he is completely repelled by Shermer, Aldridge and Beal: The two first positively denying the conversation ; and the latter stating, that he does not recollect to have ever mentioned it to Shermer. But, if the mistake had not been thus fully shewn, it would have been no more than the declaration of a single witness, contradicted by the answer, and not otherwise supported. For Ronald spoke of a different communication, and at a different place ; and therefore those two witnesses do not aid each other; because the circumstances to fortify a witness, whose statement is contradicted by the answer, must be clearly proved by indisputable evidence, and not by the deposition of another witness relating different facts, and contradicted in the same manner ; for both depositions being annulled by the answer, neither can be resuscitated, and brought to succour the other.
Nor does M’Roberts afford them any assistance. He states, that, in 1785 or 1786, after the purchase money had all been paid and the conveyance executed by Braxton, Ham, who lived in Hanover town, shewed him Love’s letter of the 20th of April, 1784, in Richmond ; and acknowledged that he knew of the power, either at the time of the purchase, or the making the conveyance, which of them he does not recollect. But to say nothing of the improbability, that Ham should be travelling about with a letter of so old a date, and should voluntarily make admissions calculated to overthrow his defence to the suit which was already commenced, it is clear, that if either period was mentioned, it must have been that of the conveyance ; because it was impossible, as before observed, that Ham should have been *apprized of it, when he contracted with Braxton in July 1783 ; and accordingly, there is not the slightest evidence that he, at that time, had any such knowledge. But, if the conveyance was the time spoken of, it is contradicted by the answer, and is not supported either by Ronald or Claiborne, both of whom speak of different periods.
There is no other testimony, upon this point, worth attention. For the attempt to shew by Griffin, that Aldridge, the attorney of Ham, had notice, proved abortive.
But it may be more than a question, how far casual conversations, without any exhibition of papers, or authority, from parties interested, to make the communication, would affect a purchaser ; for the English decisions seem to countenance the idea, that he is not bound to take notice of rumours. However, we give no opinion upon that point; because it is unnecessary, as there is no evidence, against the positive denial in the answer, that Ham ever heard the rumours.
*1044 We have no hesitation, therefore, in pronouncing that the notice is not proved.
But, if it were otherwise, Love would still not be entitled .to relief. For the answer of Braxton expressly charges, that the Virginia lands were exchanged for the English estate, in July 1784, after Ham’s purchase. was known to Love : and we think the charge is supported by the evidence. For, in the first place, it is not perceived what other motive Braxton could have had'for entering into the new security, which seems to have commenced in a, proposition to abolish the old one. But passing that over, Warden proves, that Love and Braxton applied to him in New Castle, to'assist them, as counsel, in settling all their affairs, comprehending, as he conceived, the English estate, but that his engagements . did not permit him to comply with their Request.' This is corroborated by Brooke and Ingram, who, as well as Ham, were there at the time ; and who say, they understood, that the English estate was given up, and the Virginia lands accepted in lieu of it; that it was the general conversation ' of *the day, that Braxton proclaimed it; and that nobody contradicted it. Nor does it appear, that Love ever .denied it, until the institution of this suit, in the latter part of the year 1785, although his silence was calculated to lull Ham into security, if he had been vulnerable, and to prevent his taking steps to secure himself. We conclude, therefore, that the Virginia lands were exchanged for the English estaté ; and that the latter was discharged by mutual consent.
Upon the whole, we are of opinion, that the decree of the chancellor is right; and it is accordingly affirmed.